T. B. LENOIR, Executor of W. W. Lenoir, *et al.*, Creditors, v. LIN-
VILLE IMPROVEMENT COMPANY.

(Decided June 9, 1900.)

*Receivership—Effect on Salaries of Company Officers—Ref-
eree's Finding of Facts, When Reviewable.*

1. Where a fact is found without evidence tending to prove it, the
finding is reviewable; but where, upon the whole evidence, the
referee and Court find that there was none tending to prove an
allegation, the finding is not reviewable.

2. The appointment of a receiver, for a company, who is directed to
take control of *all* the property of the company, and to assume
*entire* management of its affairs, has the effect of suspending
all the officers of the company; and they can not interfere
with the business of the company, and are entitled to no
salaries during the continuance of the receivership.

3. If the receivership had been only partial, extending only to par-
ticular property and leaving the corporation still in general
or even partial management of its affairs, the case would be
different.

CREDITOR'S BILL pending in Superior Court of MITCHELL
County. A receiver had been appointed to assume entire
control and management of the property and affairs of the
defendant company. His duties having ended, he was dis-
charged.

Petition in the cause filed by Thomas F. Parker and Har-
lan P. Kelsey, claiming balance of their salaries, as president
and secretary of the company accruing while the company was
in the hands of the receiver, heard before *Allen, J.,* at Cham-
bers, August 5, 1899, upon exceptions by petitioners to the
report of referee, who disallowed the claims. The petitioners
Parker and Kelsey excepted, and appealed from the order of
the Court confirming the report.

*Messrs. Davidson & Jones,* and *Busbee & Busbee,* for appellant.

*Messrs. E. J .Justice,* and *D. W. Robinson,* for appellee company.

DOUGLAS, J.   This is an appeal by the petitioners, Parker and Kelsey, claiming respectively as president and secretary of the company, the balance of their salaries, coming due while the company was in the hands of the receiver.   The following is the report of the referee:

### REPORT OF BURWELL, REFEREE.

This cause having been referred to me, I proceeded, on June 29, 1898, at Linville, N. C., to hear evidence upon the matters submitted to me for determination.

There were present at such hearing Messrs. Davidson and Jones, attorneys for Thomas F. Parker and Harland P. Kelsey, petitioners, and E. J. Justice, attorney for the defendant.

I send herewith the testimony of the several witnesses who were examined before me, it having been taken down by a stenographer.

When the case was called for hearing before me, counsel suggested that the following issues had been agreed upon as covering the matters in dispute:

1. Is the Linville Improvement Company indebted to the plaintiff, Thomas F. Parker, upon his claim filed in this case? If so, in what amount?

2. Is the Linville Improvement Company indebted to the plaintiff, Harlan P. Kelsey, upon his claim filed in this case? If so, in what amount?

From the testimony introduced before me by the petitioners and defendant, I find the following facts:

1. On August 21, 1893, an order was made appointing a receiver of the defendant corporation, and this order prescribed the duties of such receiver as follows: "To take into his hands all the property and effects of the Linville Improvement Company, both real and personal, together with all choses in action, debts, claims and demands of every kind; to collect all debts due the company; to keep in proper repair the houses and other property; to pay all taxes lawfully assessed against the said company, and to defend and prosecute all suits at law or in equity touching or concerning the said company, and for this purpose to employ counsel at a compensation to be fixed and allowed by the Court; to sell and dispose of, for cash, all the property of a personal nature, and especially such as is liable to deterioration, at either public or private sale, and at such times and places as he may elect to sell and dispose of the houses, lands and tenements of said company, in such quantities and at such times and places and upon such terms as he may deem best, and, upon confirmation of the said sale or sales by the Court, to execute deeds conveying such to the purchaser or purchasers."

2. That, pursuant to this order, J. F. Spainhour was duly qualified as receiver, and immediately thereafter took charge of the property and effects of defendant corporation according to the terms of the order appointing him receiver.

3. That, at the time of said appointment of a receiver, the petitioner, Thomas F. Parker, was president, and Harlan P. Kelsey was secretary of defendant corporation.

4. The charter of the defendant corporation provided that there should be a president and a secretary and a treasurer, who should be elected annually and should hold their offices respectively for one year, or until their successors should be chosen. The charter provided that the treasurer should be elected by the board of directors, and should hold his office

for one year, or until his successor should be elected or inducted into office, unless he should be removed by the board of directors, and that he should give bond with good and sufficient surety for the safe-keeping of all moneys that might come into his hands, and for the faithful discharge of all the duties of his office.

5. The by-laws of the corporation provided that the salaries or other compensation of all offices should be fixed by the directors, and might be changed or discontinued at the end of any month.

6. Thomas F. Parker was duly elected president on July 20, 1893, and immediately thereafter, at a meeting of the directors, he was elected treasurer, and as such treasurer he gave bond in the sum of $20,000.

7. At that time (July 20, 1893), Harland P. Kelsey was duly elected secretary of defendant corporation, and was duly inducted into that office.

8. At a meeting of the directors on July 20, 1893, the compensation of these offices, to-wit, president and secretary, was fixed as follows: President, $100 per month; secretary, $25 per month. The secretary and treasurer were both, *ex officio* members of the board of directors that so fixed their compensation.

9. It was always the custom of the defendant company to pay the actual expenses of the directors of the company in attending meetings whenever they made any charge for so doing.

10. That the receiver paid to each of the petitioners the amount due them on account of salary up to September 1, 1893, the date of his qualification as receiver, and his taking charge of the property and effects of the company.

11. That, after the appointment of the receiver and his entering upon the duties of his office, the petitioner, Harlan

P. Kelsey, was not called upon or required to perform any service whatever for the company, and did not in fact perform any service on its account, except attendance at meetings of the stockholders.

12. That the petitioner, Thomas F. Parker, after the appointment of receiver and his qualification, continued to act as president of the corporation as to all matters that seemed to require his attention, and interested himself in the affairs of the company and in the efforts made by himself and others to extricate the corporation from its financial difficulties. He was recognized as the president of the company at the meeting of the corporation held in 1894, and he aided and assisted the receiver in his care of the affairs of the company. No evidence was introduced before me as to the value of such services as he rendered in this behalf.

13. Thomas F. Parker attended a meeting of the corporation, and at such meeting was recognized as the president of the company, and he expended of his own means in attending such meeting the sum of seventeen and 95-100 dollars.

14. There was no contract or agreement as to compensation between the corporation and petitioners, or either of them, except such contract or agreement as is contained in the action of the stockholders and directors above set forth electing them to be officers of the company, and fixing their salaries, and inducting them into their offices.

From these facts, so found by me, I conclude that the petitioners are not entitled to prove, in this action, the claims against the corporation set up by them, the appointment of the receiver having had the legal effect of discontinuing their right to salaries from the corporation, and, as they have no claims against the corporation except for such salaries, they can not recover anything, as creditors in this action.

I disallow Mr. Parker's claim ($17.95) for expenses, be-

cause it is a claim originating entirely after this bill was filed. I therefore answer both issues 'No.' In arriving at my conclusions of fact, stated above, I have considered all the evidence relied upon by the claimants, notwithstanding the objections of defendant, and have sustained all objections made by the claimants and excluded all evidence objected to by them."

We do not feel at liberty to review the referee's finding of fact as presented to us in the first and second exceptions. Where a fact is found without any evidence tending to prove it, the finding is reviewable by us; but where, without the exclusion of any evidence whatever, the referee and Court find that there was no evidence tending to prove an allegation, how can we review the finding without passing upon the weight of the evidence? If we were to say that the Court was in error in saying that there was no evidence, and that there was evidence tending to support the allegation, we could not say that the evidence was sufficient to *prove* the allegation, as that would be passing upon its weight. Therefore, the third exception of the petitioners is all that is properly before us; and it is as follows:

"3. For that the referee erred in his conclusions of law as follows: That the petitioners are not entitled to prove in this action the claims against the corporation set up by them, the appointment of the receiver having had the legal effect of discontinuing their right to salaries from the corporation, and, as they have no claims against the corporation for such salaries, they can not recover anything as creditors in this action." The Court below confirmed the report of the referee in all respects.

We frankly admit that this case has given us much trouble, and to it we have given careful consideration. The authorities on the exact point are not numerous, but they are conflicting, and from courts of the highest respectability.

In *Spater v. Manufacturing Co.,* 47 N. J. Eq., 18, in an able opinion by the chancellor, it was held that claims for damages arising from breaches of contract for services, occasioned by the insolvency of the defendant corporation, were entitled to be paid *pro rata* out of the funds in the hands of the receiver. After calling attention to the fact that, upon the dissolution of a corporation, all its surplus assets, existing after the payment of debts, are returned to its stockholders, the Court says: "It could hardly have been the intention of the law-makers to distribute the surplus of assets, or, in other words, return capital to the stockholders of the company (that is, to those who deliberately ventured for gain and pledged their capital for the security of those who were induced to deal with them), and at the same time disregard those who, dealing with those stockholders upon the faith of that security, became justly entitled to damages for breaches of contracts occasioned by an insolvency and suspension that the very capital relied upon was intended to ward off. Such distribution would be the protection of capital against its just liability. * * * I see no reason under this law for distinguishing between cases where the breach of contract precedes the adjudication of insolvency, and cases where the breach follows in consequence of that adjudication. The insolvency, suspension of business and receivership do not extinguish the corporation's life. The Chancellor 'may' declare the charter to be forfeited and void, and 'may' direct a division of the surplus assets among the stockholders; but cases may arise, and do arise, where he should not, and does not, exercise that power, because the assets are sufficient to pay creditors and justify the discharge of the receiver so that the company may resume its business, consequently the rule that when a master dies the contract with his servant is terminated is not potent in this consideration." This is the New

Jersey rule, and there is much to commend it. But we think that the average ends of justice would be better and more generally subserved by following the New York rule, as laid down in *People v. Insurance Co.,* 91 N. Y.; 174, where the Court says, on page 178: "There was no breach of the contract between Mix and the Insurance Company by either of the parties. It was in process of continued performance according to its terms, and was unbroken at the moment when the injunction order was served. That operated upon both parties at the same instant, and perpetuated the then existing rights and conditions. Before its service, the company had done nothing to prevent performance, and we must assume was both ready and willing to perform. It had done no act which amounted to a refusal, or which made it unable to carry out its contract. For aught that appears, it would have done so if let alone. But it was not permitted to perform. The State, by the injunction order operating alike upon the company and its agents, paralyzed the action of both the contracting parties, so that neither could perform, or put the other in the wrong. Thereupon the company could not refuse, and did not refuse. To put it in the wrong and to make it liable for a breach, required action on the part of Mix. As a condition precedent, he was bound to show both ability and readiness to perform on his part. He could do neither. Performance by him had become illegal. It would have been a criminal contempt and possibly a misdemeanor. There could be neither readiness nor ability to do the forbidden and unlawful acts. So that from the necessity of the case, as there was no breach on either side before the injunction, so there could be none after. What had happened was a dissolution of the contract by the sovereign power of the State, rendering performance on either side impossible. And this result was within the contemplation of the parties, and

must be deemed an unexpressed condition of their agreement. One party was a corporation. It drew its vitality from the grant of the State, and could only live by its permission. It existed within certain defined limitations, and must die whenever its creator so willed. The general agent, who contracted with it, did so with knowledge of the statutory conditions, and these must be deemed to have permeated the agreement and constituted elements of the obligation."

Again, in distinguishing a different class of cases, the Court says, on page 180: "In all of them the companies stopped payment before any intervention of the law, and this being done by open and public notice, amounted to a voluntary refusal of performance, and, therefore, a breach of contract, established before the winding up orders were made, and the liquidators appointed. When the Court interfered, it found broken contracts and a liability for a breach already existing, and dealt with what it found. It did not break what was already broken." The Court further distinguishes a certain class of cases where property rights survive the death of the parties. We have quoted at length from this opinion because it expresses so clearly our own view of the law. It is cited and followed by the Circuit Court of the United States in *Malcomson v. Wappoo Mills,* 88 Fed. Rep., 680. This rule applies in the case at bar. The petitioners were elected to their respective offices for the purpose of having the ordinary duties of those offices properly performed. Salaries were assigned to them for the proper performance of those duties, and were paid for the full time that they were performed. The company never refused to perform its part of the contract, nor were the claimants in a condition to perform their part after the appointment of a receiver. It is true they do not appear to have been enjoined from doing so, but that was the practical effect of the order appointing the receiver. He was

directed to take control of *all* the property of the company, and to assume *entire* management of its affairs. This left nothing for the petitioners to do, as any interference with the duties of the receiver would have been a contempt of Court. It makes no difference whether their relations with the company were severed or not. It is probable that if the receiver had been discharged and the company permitted to resume the management of its own affairs during the continuance of their terms, or perhaps even if before the election of their successors, they would at once have resumed their offices with all their duties, powers and emoluments. But it is certain that during the continuance of the receivership they neither did nor could perform such duties, and that their inability to do so did not arise from any adverse action on the part of the company. As they did not perform those duties, they did not earn the salary attached to their performance, and they can not recover from the defendant for a breach of contract where the defendant has been guilty of no breach. If the receivership had been only partial, extending only to particular property, and leaving the defendant corporation still in the general and even partial management of its affairs, the case would be different.

If the petitioners rendered any service to the receiver, we do not see why they should not be paid, but they can not recover in the shape of salaries for offices that were practically in abeyance.

When this case was here before (reported in 117 N. C., 471), all that this Court decided was that the petitioners had a right to be heard upon the facts as well as the law. They have now been heard, and upon the facts as found by the referee they can not recover, in our view of the law. The judgment below is affirmed.